UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| A. RICHARD SCHUSTER, *on behalf of all others similarly situated*, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 19-cv-11679-ADB |
| ENCORE BOSTON HARBOR, WYNN MA, LLC and WYNN RESORTS, LTD., | * * * | |
| Defendants. | * | |

## <u>MEMORANDUM AND ORDER ON MOTION TO DISMISS</u>

BURROUGHS, D.J.

Plaintiff A. Richard Schuster ("Plaintiff") filed this putative class action challenging practices at the Encore Boston Harbor casino ("Encore").  [ECF No. 13 ("Am. Compl.")].  Plaintiff brings a host of state-law claims, including breach of contract (Count I), unjust enrichment (Count II), promissory estoppel (Count III), conversion/theft (Count IV), and unfair and deceptive business practices under Massachusetts General Laws Chapter 93A (Count V).  [<u>Id.</u> ¶¶ 62–97].  In particular, Plaintiff challenges Encore's practices around Blackjack payouts and slot machine winnings at the casino's redemption machines.  [<u>Id.</u> ¶¶ 2, 4].  Currently pending before the Court is Wynn MA, LLC and Wynn Resorts, Ltd.'s (collectively, "Wynn") motion to dismiss.  [ECF No. 16].[1]  For the reasons set forth below, Wynn's motion to dismiss, [ECF No. 16], is <u>GRANTED</u> in part and <u>DENIED</u> in part.

---

[1] Wynn notes in its opposition that Encore Boston Harbor is not an appropriate party as it is only the name of a casino and not a legal entity.  [ECF No. 17 at 1 n.1].

## I.      BACKGROUND

### A.      Factual Background

For purposes of this motion, the relevant facts are drawn from Plaintiff's amended complaint, [Am. Compl.], and viewed in the light most favorable to Plaintiff.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

On July 11, 2019, Plaintiff visited Encore, a casino located in Everett, Massachusetts. [Am. Compl. ¶¶ 7, 43].[2]  While visiting the casino, Plaintiff played several table games, including Blackjack.  [Id. ¶ 44].  At the Blackjack table, the dealer used eight decks of cards, dealt the cards face up, and players were not allowed to touch the cards.  [Id. ¶¶ 45, 47].  The Blackjack tables did not have a display notifying players that "even money insurance" wagers were void.  [Id. ¶ 46].  Further, the Blackjack tables paid out at 6:5 when a player was dealt "a blackjack," which Plaintiff knows because he was dealt several "blackjacks" during play and received a 6:5 payout for each.  [Id. ¶ 49].  Plaintiff alleges that the 6:5 payout and other aspects of the play at the Blackjack tables at Encore do not comply with the Massachusetts Gaming Commission's ("MGC") approved Blackjack rules.  [Id. ¶¶ 20–29].  Specifically, Plaintiff claims that according to the MGC's rules, a 6:5 payout on a blackjack is allowed only when the 6:5 variation of the game is offered, and that Encore does not offer this variation.  [Id. ¶¶ 22–29].  In addition, Plaintiff alleges that the MGC's rules require that the layout on Encore Blackjack tables that offer a 6:5 payout state that "even money insurance" wagers are void.  [Id. ¶ 46].

Plaintiff also played slot machines during his visit to Encore.  [Am. Compl. ¶ 50].  When he cashed out after playing, the slot machines issued tickets for the amount of his winnings.  [Id. ¶¶ 33, 51].  Plaintiff attempted to cash these tickets at redemption machines located throughout

---

[2] Encore opened to the public on June 23, 2019.  [Am. Compl. ¶ 14; ECF No. 17 at 2].

the casino, but the machines only paid winnings in whole dollar amounts and then issued

redemption tickets for the remaining coins that were due to Plaintiff.  [Id. ¶¶ 34–36, 52].  The

machines did not indicate how or where Plaintiff could redeem the new tickets for these coins.

[Id. ¶¶ 36–37].  Plaintiff either used these new tickets by returning to the slot machines or

discarded them when he left Encore, which Plaintiff alleges added to his overall losses.  [Id.

¶ 53].  Plaintiff claims that many of these tickets for coins are never cashed by casino customers,

and that Encore's practice of issuing these tickets for coins is unfair and deceptive because it

entices customers to return to slot machines to continue playing rather than giving them the

money they are owed.  [Id. ¶¶ 38, 40].

### B.    Procedural Background

On July 15, 2019, Plaintiff filed an action in Middlesex County Superior Court alleging

breach of contract, unjust enrichment, promissory estoppel, and conversion/theft based on

gaming practices at the Encore casino, which is run by Wynn.  [ECF No. 1-2 ("Complaint" or

"Compl.")].  That same day, Plaintiff served Wynn a formal demand letter pursuant to

Massachusetts General Laws Chapter 93A and a draft of an amended complaint that added a

Chapter 93A claim.  [ECF No. 29-1].  On August 5, 2019, Wynn removed the case pursuant to

the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).  [ECF No. 1].  On August 28, 2019,

Plaintiff amended the complaint by right and added his Chapter 93A claim.  [Am. Compl.].  On

September 11, 2019, Wynn filed the instant motion to dismiss.  [ECF No. 16].  On October 21,

2019, Plaintiff opposed the motion, [ECF No. 26], and on November 1, 2019, Wynn replied to

Plaintiff's opposition, [ECF No. 29].

## II.      LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir.

2012)).  Second, the Court "must determine whether the remaining factual content allows a

'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting

Morales-Cruz, 676 F.3d at 224).

## III.    DISCUSSION

Wynn argues that the MGC's Rules of Blackjack allow a payout at 6:5 odds on "a

blackjack" without using the 6:5 variation, as long as the payout odds are displayed to casino

customers.  [ECF No. 17 at 4].  As to Plaintiff's slot machine allegations, Wynn states that the

redemption ticket issued for the remaining change from slot machine winnings can be redeemed

at any of the casino's cashier windows.  [Id. at 12–13].

### A.      Consideration of Extrinsic Documents

As an initial matter, the parties disagree about what extrinsic documents the Court may

consider in ruling on the motion to dismiss.  Wynn asks that the court take judicial notice of (1)

the MGC's Rules of Blackjack, [ECF No. 17-1 ("MGC Rules")]; (2) the MGC Investigation and

Enforcement Bureau's ("IEB") July 18, 2019 report regarding Plaintiff's complaint ("IEB

Report"), [ECF No. 17-2]; and (3) the transcript of the MGC's July 18, 2019 public meeting

("Meeting Transcript") in which the MGC reviewed the IEB's preliminary findings as to

Plaintiff's claims, [ECF No. 17-3]; see [ECF No. 17 at 2 n.2, 6 n.7].  Plaintiff concedes that the

Court's may consider the MGC's Rules of Blackjack, [ECF No. 26 at 12], but opposes Wynn's

requests regarding the IEB Report and the Meeting Transcript, [id. at 12–14].

When reviewing a motion to dismiss under Rule 12(b)(6), the Court "may consider

'documents the authenticity of which are not disputed by the parties; . . . documents central to

plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'"  Curran v. Cousins,

509 F.3d 36, 44 (1st Cir. 2007) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  "This

is true even when the documents are incorporated into the movant's pleadings." Id. (citing

Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998)).  A court, however, "will

only take into consideration the existence and contents" of such documents and "will not assume

the truth of the findings asserted therein . . . ." Barnstable Cty. v. 3M Co., No. 17-cv-40002,

2017 U.S. Dist. LEXIS 207414, at *15 (D. Mass. Dec. 18, 2017).  For example,

> [w]hile a legislative report is a public record properly subject to judicial notice of
> its 'existence and contents, this does not mean that the court must accept the
> findings in the report as indisputable truth; the findings are merely evidence of the
> facts asserted . . . .  The credibility of such evidence will vary according to the
> thoroughness and impartiality with which the committee conducted its
> investigation, the fairness of its procedure, [and] the fullness of opportunity it
> afforded accused individuals or organizations to develop their side of the
> story . . . .'

Alharbi v. Beck, 62 F. Supp. 3d 202, 209 (D. Mass. 2014) (quoting Stasiukevich v. Nicolls, 168

F.2d 474, 479 (1st Cir. 1948)).

First,  given that Plaintiff incorporated the MGC Rules of Blackjack by reference in his

amended complaint and does not dispute that the Court may review these in connection with

Wynn's motion to dismiss, the Court will take judicial notice of the rules.

Second, Plaintiff claims that the IEB Report and Meeting Transcript constitute a

"'preliminary' finding" of the IEB that arose out of "biased opinions . . . made less than 72 hours

after this lawsuit was filed, without a meaningful opportunity for a full investigation."  [ECF No.

26 at 13 (emphasis omitted)].[3]  Plaintiff further argues that the IEB Report "is not an official

finding or endorsement of the MGC itself, or any of its duly appointed commissioners."  [Id. at

---

[3] Plaintiff questions the IEB's findings, as he was not contacted by the IEB and the investigation
"rel[ied] on general assertions regarding Encores [sic] gaming practices."  [ECF No. 26 at 13–
14].

13 (emphasis omitted)].[4]  Plaintiff is correct in several respects: the IEB Report is dated July 18,

2019 and the public meeting was held that same day, just three days after Plaintiff filed his

complaint in state court.  [ECF No. 1-2 at 2; ECF Nos. 17-2, 17-3].  In addition, the IEB Report,

a one-and-a-half page document with photographs attached, explicitly states that the findings

contained therein are "preliminar[y]."  [ECF No. 17-2 at 2].

Because Plaintiff has not challenged the authenticity of the IEB Report or Meeting

Transcript—for example, by suggesting that they are inaccurate versions of the report or

transcript—the Court will review and consider both documents only insofar as they demonstrate

that the IEB conducted an investigation into Plaintiff's complaint, reached a preliminary finding,

and presented that preliminary finding at a public meeting attended by MGC commissioners on

July 18, 2019.  See Barnstable Cty., 2017 U.S. Dist. LEXIS 207414, at *15.  The Court will not,

however, "accept the findings in the report [or transcript] as indisputable truth."  See Alharbi, 62

F. Supp. 3d at 209.  As to any deference owed to the IEB or MGC in connection with the

preliminary findings contained in the Report and Meeting Transcript, the Court will address this

in Section III.C, infra.

**B.**     **Overview of the MGC's Rules of Blackjack**

Massachusetts regulations state that

> [o]nly those table games and their rules authorized by the Commission and posted
> on the Commission's website in accordance with 205 CMR 147.03(1) may be
> offered for play in a gaming establishment.  A gaming licensee shall not offer a new
> game or game variation for play until the new game or game variation has been
> approved by the Commission . . . .

---

[4] Plaintiff notes that the IEB Report was written by, and that the Meeting Transcript prominently
features a presentation by, IEB Assistant Director Bruce Band, who is not a commissioner.  [ECF
No. 26 at 13].

205 C.M.R. § 147.02.  The MGC has promulgated rules for various table games, including

Blackjack, which are available through the MGC's website.  See [MGC Rules]; MGC, Blackjack

(2019), available at https://massgaming.com/wp-content/uploads/RULES-Blackjack-2-11-

19.pdf.  A player wins their wager on a hand of blackjack when:

(1) The score of the player is 21 or less and the score of the dealer is in excess of
21;
(2) The score of the player exceeds that of the dealer without either exceeding 21;
or
(3) The player has achieved a score of 21 in two cards and the dealer has achieved
a score of 21 in more than two cards.

[MGC Rules at 3].  There are several other ways of obtaining a payout prior to the final wager,

including being dealt "a blackjack," which the rules define as "an ace and any card having a

point value of 10 dealt as the initial two cards to a player,"  [id. at 2], and "insurance wagers,"

which a player may choose to make in addition to their initial wager "[w]henever the first card

dealt to the dealer is an ace," [id. at 12].

Section 3 of the rules, titled "Wagers," states that "[a]ll winning wagers . . . shall be paid

at odds of 1 to 1 with the exception of standard blackjack which shall be paid at odds of 3 to 2, or

at odds of 6 to 5 for the 6 to 5 blackjack variation."  [MGC Rules at 4].  Section 3 also provides

required alternative odds for specific types of winning wagers, such as "[t]hree cards consisting

of three 7's of any suit" being paid at odds of 3:2.  [Id.].

Procedures for dealing cards in the 6:5 variation of Blackjack are set out at Section 6a of

the rules.  [MGC Rules at 10–11].  The 6:5 variation allows for the use of two additional cut

cards and one or more decks of cards, and also requires the use of an automated card shuffling

device, wagers to be made in multiples of $5.00, and wagers to be paid at odds of 6:5.  [Id. at 2,

3, 4].

Section 7 of the rules, titled "Payment of blackjack; even-money payout options for certain insurance wagers," provides the rules for payouts on "a blackjack" (as opposed to a winning wager) and selected insurance wagers.  [MGC Rules at 11].  Subsections (a) and (b) of that rule specify a payout at 3:2 odds on "a blackjack."  [Id.].  Subsection (c) allows an even-money payout (1:1 odds) if a player has "a blackjack" and does not make an insurance wager.  [Id.].  Subsection (d) of that rule states,

> If the licensee chooses the option to pay a blackjack at odd[s] of 6 to 5 and doesn't use the 6 to 5 variation, then Section 7(c) is void.  If the licensee uses this option on 6 or 8 deck games, this variation's rules must be displayed on the layout in plain sight.

[Id.].

### C.      Encore's 6:5 Payout on "a Blackjack"[5]

Plaintiff's Blackjack allegations are limited to the appropriate odds for the payout on "a blackjack."  [Am. Compl. ¶ 20].  Plaintiff alleges that a player paid out at 6:5 odds on "a blackjack" would receive twenty percent less than a player receiving a payout at 3:2 odds.  [Id.

---

[5] On July 1, 2020, Wynn filed a notice of supplemental authority, [ECF No. 30], alerting the Court to a recent decision by the Hampden County Superior Court regarding blackjack practices at the MGM Springfield casino and the MGC Rules of Blackjack, [ECF No. 30-1 (DeCosmo v. MGM Springfield LLC, No. 1979CV0574 (Mass. Super. Ct. June 29, 2020))].  Plaintiff further informed the Court that the plaintiff in DeCosmo has appealed the Superior Court's order.  [ECF No. 31].  Even aside from the fact that the DeCosmo case involves different parties and a different casino which offers unknown blackjack practices and layouts, this Court is not bound by the Superior Court decision.  See Vertex Surgical, Inc. v. Paradigm Biodevices, Inc., 648 F. Supp. 2d 226, 231 n.2 (D. Mass. 2009) ("Although lower state court decisions may provide guidance to the federal court, and are entitled to some weight, the decisions of those courts are not binding." (citing Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008))).  When "the Supreme Judicial Court has not had the opportunity to speak on the issue, 'the federal court must make an informed prophecy as to the state court's likely stance.'"  Shepperson v. Metro. Prop. & Cas. Ins. Co., 312 F. Supp. 3d 183, 195 (D. Mass. 2018) (quoting Vertex, 648 F. Supp. 2d at 231 n.2).  With due respect to the Superior Court, this Court has made its own review of the facts specific to this case and the MGC Rules of Blackjack and related regulations and has reached its own conclusions as to how the Supreme Judicial Court might approach the issues raised by Plaintiff.  See id.

¶ 66; ECF No. 26 at 15].  In order to determine whether Plaintiff has made a plausible claim that a 6:5 payout on "a blackjack" is contrary to the MGC's Rules of Blackjack, the Court must interpret the express language of the rules, an undertaking akin to statutory interpretation.

"When engaged in the task of statutory interpretation, 'courts . . . should . . . attempt to give meaning to each word and phrase.'"  Grunbeck v. Dime Sav. Bank, FSB, 74 F.3d 331, 338 (1st Cir. 1996) (quoting United States v. Flores, 968 F.2d 1366, 1371 (1st Cir. 1992)).

> The object of statutory interpretation is 'to ascertain the true intent of the Legislature from the words used.  [The court] will not add words to a specific statute the Legislature did not put there, either by inadvertent omission or by design. Moreover, where the Legislature has employed specific language in one portion of a statute, but not in another, the language will not be implied where it is absent.'

Lowell Hous. Auth. v. PSC Int'l, Inc., 692 F. Supp. 2d 180, 186 (D. Mass. 2010) (quoting Simmons v. Clerk-Magistrate of Boston Div. of Hous. Court Dept., 858 N.E.2d 727, 733 (Mass. 2006)).  In addition, "[a]s 'the meaning of statutory language, plain or not, depends on context,' we must 'look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'"  Simmons v. Galvin, 575 F.3d 24, 35 (1st Cir. 2009) (quoting Dada v. Mukasey, 554 U.S. 1, 16 (2008)); see Nken v. Holder, 556 U.S. 418, 426 (2009) ("[S]tatutory interpretation turns on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997))).

As noted above, Section 7(d) is contained within a section titled "Payment of blackjack; even-money payout options for certain insurance wagers."  [MGC Rules at 11].  The subsection begins with: "[i]f the licensee chooses the option to pay a blackjack at odd[s] of 6 to 5 and doesn't use the 6 to 5 variation then Section 7(c) is void."  [Id.].  Both Wynn and the IEB Report indicate that Encore does not offer the 6:5 variation.  [ECF No. 17 at 4; ECF No. 17-2 at 2].  The subsection next states: "[i]f the licensee uses this option on 6 or 8 deck games, this variation's

rules must be displayed on the layout in plain sight." [MGC Rules at 11]. The Court interprets "this option" to be a reference to "the option to pay a blackjack at odd[s] of 6 to 5" from the first sentence of this subsection. Wynn agrees that Encore offers 6:5 payouts on "a blackjack" at some of its Blackjack tables and that it uses eight decks for its blackjack games. [ECF No. 17 at 4 n.5, 8]. According to this subsection, because Wynn chooses to offer a 6:5 payout on "a blackjack" on six-or-eight-deck games at Encore, "this variation's rules must be displayed." [MGC Rules at 11].

Plaintiff's view is that a 6:5 payout on "a blackjack" is not authorized under the rules. [Am. Compl. ¶¶ 18, 20, 22; ECF No. 26 at 14–15, 24]. In the alternative, Plaintiff states that, if a 6:5 payout is authorized, then "this variation's rules" in Section 7(d) is a reference to the fact that a Blackjack table must include a display stating that the even-money payout option under Section 7(c) is void when a 6:5 payout is offered. [Am. Compl. ¶ 46; ECF No. 26 at 26].

Regarding whether Plaintiff has plausibly claimed that a 6:5 payout on "a blackjack" is not authorized under the rules, the rules do appear to allow these odds on "a blackjack" in a limited circumstance. Section 3, "Wagers," discusses a 6:5 payout on a winning wager only in the context of the 6:5 variation. [MGC Rules at 4 ("at odds of 6 to 5 for the 6 to 5 blackjack variation")]. Section 7, however, is specific to "[p]ayment of blackjack" and discusses a 6:5 payout on "a blackjack" where a casino does not use the 6:5 variation. [Id. at 11]. In addition to the language of the rules themselves, the Court looks to the gaming regulations which discuss the display required on the layout, or felt, of a Blackjack tabletop, including information regarding odds, rules, and insurance wagers. See 205 C.M.R. § 146.13. The regulations provide for three possible layouts: one for a table with a 3:2 payout, § 146.13(3); one for a table with a blackjack rule variation at a 1:1 payout, § 146.13(4); and one for a table with the 6:5 variation and a 6:5

payout, § 146.13(14).  Id.  It is not clear from the regulations, however, whether the odds

displayed refer to the payout on any winning wager or specifically on "a blackjack."  In any case,

unlike Section 7(d) of the MGC's Blackjack Rules, the regulations do not provide for a layout

with a 6:5 payout on a winning wager or on "a blackjack" without the 6:5 variation, see id.,

which lends credence to Plaintiff's contention that a 6:5 payout is not authorized for the game

being played at the Wynn tables.[6]

Looking to the broader purpose of the rules and regulations, it is clear that one of the

MGC's goals is to ensure that players have notice of the rules.  See 205 C.M.R. § 147.02 ("Only

those table games and their rules authorized by the Commission and posted on the Commission's

website in accordance with 205 CMR 147.03(1) may be offered for play in a gaming

establishment."); id. § 147.03 (discussing requirements for notifying customers of rules for table

games); id. § 146.13 (requiring Blackjack tables to include the rules of the game on the layout or

felt of the table itself). See generally [MGC Rules (containing various requirements for notice to

customers of rules and variations)].  Taken together, the regulations and MGC Rules of

Blackjack, along with the broader policy of notice to customers, suggest that a 6:5 payout on "a

blackjack" absent the 6:5 variation may not be allowed.  See Simmons, 575 F.3d at 35 (advising

courts to look at statutory language as well as the design of a statute, and the object and policy of

a statute).

Assuming for present purposes that the rules do authorize a 6:5 payout on "a blackjack,"

the Court turns to whether Section 7(d) requires specific language to be displayed on the table

---

[6] According to photographs that accompany the IEB Report, Encore's tables contain language
that combines the requirements of § 146.13(3) (3:2 payout) and § 146.13(14) (6:5 variation and
6:5 payout) to wit: "Blackjack pays 6 to 5; Dealer must draw to 16 and soft 17 and stand on hard
17's and all 18's; Pays 2 to 1 – Insurance – Pays 2 to 1."  [ECF No. 17-2 at 5].

layout.  Wynn insists that "Section 7(d), both by its plain terms and as interpreted by the MGC, requires a licensee that chooses to pay blackjack at 6 to 5 without using the 6 to 5 blackjack variation to display <u>the selected payout</u> in plain sight."  [ECF No. 17 at 8 (emphasis in original)]; <u>see also</u> [<u>id.</u> at 11 ("Section 7(d) of the Blackjack Rules explicitly permit the conduct challenged in the Complaint: paying a blackjack at 6 to 5 odds without using the 6 to 5 blackjack variation so long as notice of the elected <u>payout is displayed in plain sight</u>." (emphasis added)); ECF No. 29 at 1 ("Section 7(d) permits a gaming licensee to elect the option to pay a blackjack at 6 to 5 odds without using the 6 to 5 blackjack variation so long as the licensee <u>displays notice of the elected payout in plain sight</u> on the blackjack table. . . . it is undisputed that Encore Boston Harbor . . . <u>displays the selected 6 to 5 payout in plain sight</u> . . . ." (emphasis added)), 2 (same), 4 (same)].  No matter how many times Wynn repeats this mantra, however, the language of Section 7(d) does not state that a casino must display "the selected payout" in plain sight, but instead states that a casino must display "this variation's rules" in plain sight.  <u>See</u> [MGC Rules at 11].

Nor can this Court conclude that "selected payout" means the same thing as "this variation's rules" as Wynn seems to suggest.  When "language is clear, plain, and unequivocal, [it] therefore 'should be given effect consistent with its plain meaning.'"  <u>Craw v. Hometown Am., LLC</u>, No. 18-cv-12149, 2019 U.S. Dist. LEXIS 46674, at *24 (D. Mass. Mar. 21, 2019) (quoting <u>Sullivan v. Town of Brookline</u>, 758 N.E.2d 110, 115 (Mass. 2001)).  The Oxford English Dictionary ("OED") defines "rule" as "[a] regulation governing the playing of a game or sport."  *Rule*, OED Online, https://www.oed.com/view/Entry/168717?rskey=cAt93K&result=1#eid (last visited July 8, 2020).  The OED defines "variation" as "[a]n instance of varying or changing; an alteration or

change in something, esp. within certain limits." *Variation*, OED Online,

https://www.oed.com/view/Entry/221526?redirectedFrom=variation#eid (last visited July 8,

2020).  Lastly, the OED defines "payout" as "[a] (large) amount of money paid out, esp. as

compensation or a dividend."  *Payout*, OED Online,

https://www.oed.com/view/Entry/139198?rskey=DlkM6U&result=2&isAdvanced=false#eid

(last visited July 8, 2020).

     Looking at these terms in context, the MGC Rules of Blackjack do not use the terms

"payout," "rule," and "variation" interchangeably.  See, e.g., [MGC Rules at 4 (Section 3(e) uses

"variation" and "payout" in two different contexts: "6 to 5 variation" and "payout odds")].  In

every other section of the rules, the term "variation" is only ever used in combination with "6 to

5 variation" and "rule variation multiple action blackjack"—in other words, it is used in

connection with unique variations of the game's rules, rather than payouts.  Compare [MGC

Rules at 2, 3, 4, 6, 7, 10, 11, 12, 13, 15, 16 ("6 to 5 blackjack variation"); 12, 14 ("rule variation

multiple action blackjack")], with [id. at 11 ("If the licensee chooses the option to pay a

blackjack at odd[s] of 6 to 5 and doesn't use the 6 to 5 variation . . . . this variation's rules must

be displayed on the layout in plain sight.")].  Within Section 7(d) itself, the terms "pay,"

"variation," and "rules" are each used, suggesting that the MGC intended each term to have an

independent meaning, rather than using the terms interchangeably, as Wynn suggests.  See

[MGC Rules at 11].  Therefore, under Section 7(d), while "this variation's rules" (a variation or

change in the rules or regulations governing "a blackjack") could refer specifically to a 6:5

payout, it could also refer, as Plaintiff contends, to the fact that Section 7(c) is void when a 6:5

payout on "a blackjack" is offered under the terms of Section 7(d), or it could refer to the rules of

a third variation that differs from the rules of the 3:2 or 6:5 variations beyond the payout offered on "a blackjack."[7]

Wynn asks the Court to give deference to what it describes as the MGC's interpretation of Section 7(d). [ECF No. 17 at 7]. Several days after Plaintiff filed his complaint in state court, the IEB, the division of the MGC tasked with enforcement of its rules and regulations, presented its preliminary Report and findings regarding Plaintiff's claims at a public meeting. [ECF Nos. 17-2, 17-3]; see also Mass. Gen. Laws ch. 23K § 6(a) ("There shall be within the commission an investigations and enforcement bureau which shall be the primary enforcement agent for regulatory matters under this chapter."). The IEB Report notes the difference between the 6:5 blackjack variation and a 6:5 payout on "a blackjack," and states that "[t]he 6 to 5 blackjack variation is not currently offered at Encore." [ECF No. 17-2 at 2]. The Report claims that Encore provides tables with payouts for "a blackjack" at 3:2 and 6:5 and that these payouts are "displayed on each table's felt layout . . . ." [Id.]. In addition, the IEB Report states that "Section 7(d) of the rules of blackjack requires that notice be provided as to which payout option is being used for blackjack at each table." [Id. (emphasis added)]. With regard to Plaintiff's claims, the report concludes that "[t]he IEB's gaming agents reviewed the claims and have preliminarily found Encore to be in compliance with the Commission's rules and regulations for paying out blackjack wins." [Id.].

---

[7] This Court finds it plausible that, given the rules and regulations' focus on notifying players about rules and variations, it would be reasonable to require the casino to inform players of "this variation's rules," even if that phrase was interpreted to refer to the fact that even money insurance bets were not allowed. Contra [ECF No. 30-1 at 7 (DeCosmo, No. 1979CV0574, at 6) (stating that it would be confusing to inform players that even money insurance bets were not allowed when "a blackjack" is offered with a 6:5 payout)]. This would allow a player to make a reasoned determination as to whether he or she wants odds of 3:2 with the insurance option or 6:5 odds without that option.

At the public meeting, IEB Assistant Director Bruce Band ("Band") presented his findings to the commissioners.  [ECF No. 17-3 at 15–23].  He discussed the difference between a 6:5 payout on "a blackjack" and the 6:5 blackjack variation, and reviewed the MGC Rules of Blackjack, including Section 7(d).  [Id. at 16–18].  As to Section 7(d), Band stated that "Section 7d of the rules of blackjack requires that notice be provided as to which option is being used at the blackjack table."  [Id. at 17 (emphasis added)].  The commissioners asked Band a series of questions, and the MGC's then-executive director, Edward R. Bedrosian Jr., also participated in the discussion.  See [id. at 15–23].  At no time, however, did the commissioners engage in a substantive review of Section 7(d) or analyze the language in the MGC Rules of Blackjack regarding the appropriate payout odds for "a blackjack" under any section of the Rules.[8]

Although Wynn seeks to characterize the IEB Report and Meeting Transcript as the MGC's interpretation of its rules, [ECF No. 17 at 7], the Court does not view the IEB's findings—issued just days after Plaintiff filed his complaint and which the IEB itself described as preliminary—as the MGC's express or definitive interpretation of its rules.  Further, the Meeting Transcript reflects that the commissioners reviewed Band's findings, but does not evidence any analysis by the MGC of its rules beyond the commissioners' discussion and understanding of Band's preliminary findings.  See generally [ECF No. 17-3 at 15–23].  Courts will defer to a state agency's interpretation of its own statutes and regulations when that interpretation reflects a "well-informed decision . . . supported by substantial evidence . . . ."  Mass. Sober Hous. Corp. v. Automatic Sprinkler Appeals Bd., 850 N.E.2d 585, 590 (Mass. App.

---

[8] Band, Bedrosian, and the commissioners also discussed whether other states allow for a 6:5 payout on "a blackjack," but the Court notes that their discussion as to whether other states allow these odds is not a clear conclusion that the MGC's own rules allow these odds.  [ECF No. 17-3 at 17, 21–22].

Ct. 2006); see City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 94 (1st Cir. 2008) ("Federal courts generally defer to a state agency's interpretation of those statutes it is charged with enforcing . . . ." (citation omitted)).  Wynn has failed to demonstrate, however, that the IEB Report or Meeting Transcript reflects a "well-informed decision" of the MGC given the limited analysis and the fact that the MGC itself characterized the report and its findings as preliminary.

Viewing the language of Section 7(d) in context and taking the IEB Report and Meeting Transcript as evidence of a preliminary finding only, the Court finds that Plaintiff has made a plausible claim as to Encore's potential violation of the MGC's rules regarding the appropriate payout odds on "a blackjack," or, in the alternative, Encore's failure to comply with the notice requirements of Section 7(d) regarding even-money insurance wagers.  See Twombly, 550 U.S. at 570.

### D.     Encore's Coin Redemption Practices

Wynn also seeks to dismiss Plaintiff's claims related to the redemption of "cashout" tickets from slot machines.  [ECF No. 17 at 12–13].  Plaintiff claims that Encore's redemption machines issue whole dollar amounts only, and then redemption tickets for the balance in coins. [Am. Compl. ¶¶ 36–37].  Plaintiff further alleges that these tickets do not tell customers how to redeem the balance on these tickets.  [Id. ¶ 36].  Wynn contends that its redemption machines are not required to issue coins in addition to whole dollar values, and that redemption tickets may be redeemed at any cashier window.  [ECF No. 17 at 12–13].

Wynn again relies on the IEB Report and Meeting Transcript in support of its arguments that its slot machine practices do not violate the law or MGC regulations.  [ECF No. 17 at 12–13].  The IEB Report, however, simply states that customers "must redeem their ticket at the cashier's cage" without addressing Plaintiff's claim regarding whether and how customers are

notified of this option.  [ECF No. 17-2 at 3].  The IEB Report also notes, and the Meeting

Transcript reflects, that—in the days between Plaintiff filing his complaint and the issuance of

the IEB Report—"[t]o eliminate confusion surrounding this issue, Encore has placed signage on

its redemption machines explaining that the machines will only dispense cash and not coin."

[Id.; id. at 6 (photograph of new signage); ECF No. 17-3 at 19 (discussing new signs)].[9]  During

the July 18, 2019 meeting, Band stated that "[w]hat we did find is that [information regarding

redemption of tickets for coins] probably was not posted clearly enough by Encore . . . ."  [ECF

No. 17-3 at 19].  Band also made clear that, under Massachusetts General Laws Chapter 23K,

any unclaimed winnings are turned over to the Commonwealth—not kept by the casino—at the

end of each year.  [Id.]; Mass. Gen. Laws ch. 23K, § 53 ("Unclaimed cash and prizes shall be

retained by the gaming licensee for the person entitled to the cash or prize for 1 year after the

game in which the cash or prize was won.  If no claim is made for the cash or prize within 1 year,

the cash or equivalent cash value of the prize shall be deposited in the Gaming Revenue Fund

established in section 59.").  In addition to the new signs, commissioners also suggested other

changes, such as displaying larger signs regarding coin redemption options or offering machines

that would dispense coins.  [ECF No. 17-3 at 29, 32–33].  Robert DeSalvio, the then-president of

Encore, was present at the public meeting and stated that he would take these suggestions under

advisement.  [Id. at 29, 31–32].

---

[9] Wynn disingenuously suggests that Plaintiff's allegations are false due to this new signage
without noting that the signs were added to the machines after Plaintiff filed his complaint.
[ECF No. 17 at 13 n.10].  But see [ECF No. 17-3 at 18 (Band stating that the signs were recently
added to the machines), 26–27 (then-president of Encore Robert DeSalvio stating that the signs
were added for clarity); ECF No. 29 at 8 n.5 ("[A]s of July 18, 2019, Encore's ticket redemption
machines contain straightforward signage regarding Encore's redemption procedures.")].

Wynn's assertion that redemption tickets *could* be redeemed at cashier windows does not negate Plaintiff's allegation that the redemption machines and tickets did not instruct customers as to where they could redeem the tickets for coins.  It is plausible that prior to the new signage on the machines, customers such as Plaintiff would take their cash from the redemption machine, see the redemption ticket, and—in the absence of clear instructions otherwise—assume that their only option was to use the redemption ticket in the slot machines.  The Court finds that Plaintiff has therefore stated a plausible claim for relief.  See Twombly, 550 U.S. at 570.

        1.      <u>Chapter 93A Claim</u>[10]

In its reply brief, Wynn claims that Plaintiff's Chapter 93A claim as to the slot machine allegations must fail because Plaintiff's demand letter, which references allegations made in Plaintiff's complaint, did not address the same claims contained in Plaintiff's amended

---

[10] Wynn seeks to benefit from an exemption contained within Chapter 93A by arguing that its practices are approved by the MGC.  <u>See</u> [ECF No. 17 at 9].  That exemption provides:

> Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States.  For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions.

Mass. Gen. Laws ch. 93A, § 3.  In light of the Court's findings in Section III.C, <u>supra</u>, regarding the plausibility of Plaintiff's claims that Encore's 6:5 payouts on "a blackjack" are not authorized under MGC rules and regulations, Wynn has failed to demonstrate that it is entitled to rely on this exemption as to Plaintiff's blackjack allegations.  <u>See</u> <u>Estrada v. Progressive Direct Ins. Co.</u>, 53 F. Supp. 3d 484, 502 (D. Mass. 2014) ("A defendant's burden in claiming the exemption is '. . . a difficult one to meet.  To sustain it . . . . a defendant must show that such scheme affirmatively <u>permits</u> the practice which is alleged to be unfair or deceptive.'" (quoting <u>Commonwealth v. Fremont Inv. & Loan</u>, 897 N.E.2d 548, 561 (Mass. 2008))).  The Court's analysis of Plaintiff's Chapter 93A claim as to Encore's slot machine practices, Section III.D.1, also demonstrates that the exemption is not available to Wynn on that claim.

complaint. [ECF No. 29 at 9 n.6].[11] "The purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum," therefore this argument is waived. Noonan v. Wonderland Greyhound Park Realty LLC, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) (citing Wills v. Brown University, 184 F.3d 20, 27 (1st Cir. 1999)). In any case, even if it were not waived, Wynn's argument is unavailing.

In the complaint attached to the demand letter, Plaintiff claimed that Encore's redemption machines were rounding down to whole dollar values and that "Encore only paid out whole dollars, and failed to pay the balance due on these tickets." [ECF No. 29-1 ¶¶ 36, 46].[12] Plaintiff also alleged, however, as he does in his amended complaint, that "[t]he ticket redemption machines . . . only pay out whole dollar amounts, without change, and without instruction on how to redeem the balance." [Id. ¶ 35]; see also [Am. Compl. ¶ 36].

"Pursuant to chapter 93A, a claimant seeking relief must send a written demand 'reasonably describing the unfair or deceptive act or practice relied upon' by the claimant." Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 205 (1st Cir. 2004) (quoting Mass. Gen. Laws ch. 93A, § 9(3)). "One function of the demand letter 'is to encourage negotiation and settlement by notifying prospective defendants of claims arising from allegedly unlawful conduct.'" Casavant v. Norwegian Cruise Line, Ltd., 952 N.E.2d 908, 913 (Mass. 2011) (quoting Slaney v. Westwood Auto, Inc., 322 N.E.2d 768, 779 (Mass. 1975)). Demand letters

---

[11] The Court notes that Wynn raised this ground for dismissal in its reply only, depriving Plaintiff of an opportunity for rebuttal.

[12] Plaintiff did not attach his demand letter to his complaint, but the Court may consider the letter in connection with his Chapter 93A claim. See Flores v. OneWest Bank, F.S.B., 886 F.3d 160, 167 (1st Cir. 2018) (affirming motion to dismiss and noting that the district court could take notice of the letter in part because plaintiffs are required to reference a demand letter in a complaint that alleges a Chapter 93A claim); [Am. Compl. ¶ 95 (noting that demand letter was mailed to Wynn on July 15, 2019)].

must therefore "set out specifically any activities . . . as to which they seek relief.  Separate relief on actions not so mentioned is foreclosed as a matter of law."  Flores v. OneWest Bank, F.S.B., 886 F.3d 160, 167 (1st Cir. 2018) (quoting Passatempo v. McMenimen, 960 N.E.2d 275, 293 (Mass. 2012)).

In Neuhoff v. Marvin Lumber & Cedar Co., the First Circuit affirmed dismissal of a Chapter 93A claim where the plaintiffs' demand letter mentioned only unfair or deceptive practices in connection with selling defective windows, but did not mention a claim that was later added to their complaint regarding false or deceptive promises to replace defective windows.  370 F.3d at 205–06; see also Shaw v. BAC Home Loans Servicing, LP, No. 10-cv-11021, 2013 U.S. Dist. LEXIS 28863, at *15 (D. Mass. Mar. 1, 2013) (dismissing Chapter 93A claim where plaintiff's demand letter alleged only that lender failed to follow federal loan modification procedures but complaint added a predatory lending claim).  In contrast, in Casavant v. Norwegian Cruise Line, Ltd., the Massachusetts Supreme Judicial Court held that, where a demand letter made allegations regarding a cruise line's practices in connection with providing a refund, the plaintiffs were not foreclosed from pursuing an allegation regarding the violation of a state regulation on refunds even though the demand letter did not include this specific claim.  952 N.E.2d at 914.

Plaintiff's allegations are more closely aligned to those of the plaintiffs in Casavant, as the additional details Plaintiff provided in his amended complaint do not alter the nature of his claims regarding the redemption machines, nor did Plaintiff add a new count to his amended complaint based on this additional information.  The Court therefore finds that Plaintiff's allegations in the initial complaint attached to the demand letter were sufficient to put Wynn on notice of his claims regarding the slot machines.  See Richards v. Arteva Specialties S.A.R.L.,

850 N.E.2d 1068, 1075 (Mass. App. Ct. 2006) ("The plain language of G. L. c. 93A, § 9(3), only requires the demand letter to 'reasonably describ[e] . . . the injury suffered.'" (alteration in original)).  Plaintiff alleged then and continues to allege that Encore's "ticket redemption machines . . . only pay out whole dollar amounts, without change, and without instruction on how to redeem the balance."  [ECF No. 29-1 ¶ 35]; see also [Am. Compl. ¶ 36 ("The ticket redemption machines, however, only pay out whole dollar amounts, without coins, and without instruction on how to redeem the balance."); ECF No. 29-1 ¶ 76 ("The defendants have unlawfully and wrongfully exercised dominion and control over Plaintiff's and members of the class' money by withholding and otherwise failing to pay change remaining on slot machine cashout tickets."); Am. Compl. ¶ 82 ("The defendants have unlawfully and wrongfully exercised dominion and control over Plaintiff's and members of the class' money by withholding and otherwise failing to pay coins remaining on slot machine 'cashout' tickets.")].  Accordingly, Plaintiff's Chapter 93A claim as to Wynn's slot machine practices is viable and Wynn's motion to dismiss the claim on these grounds is DENIED.

### 2.    Unjust Enrichment Claim

Wynn next argues that Plaintiff's unjust enrichment claim must be dismissed because there exists an adequate remedy at law.  [ECF No. 17 at 13].  This claim appears to be focused on Plaintiff's allegations regarding slot machine redemption tickets.  See [Am. Compl. ¶ 70 ("All monies paid to defendants that should have been paid or returned to Plaintiff and members of the class constitute a benefit that the defendants aggressively sought and voluntarily accepted.")].  The First Circuit has recently clarified that a "common law claim for unjust enrichment . . . fails because a party with an adequate remedy at law cannot claim unjust enrichment."  Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017).  Even if a plaintiff's remedies at law are

dismissed, "[i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment."  Id.; Tomasella v. Nestlé United States, Nos. 19-1130, 19-1131, 19-1132, 2020 U.S. App. LEXIS 18885, at *48–49 (1st Cir. June 16, 2020) ("The viability of [plaintiff's] Chapter 93A claims is beside the point.  [Plaintiff's] unjust enrichment claims must be dismissed because an adequate remedy at law was undoubtedly available to her through Chapter 93A." (internal citation and quotation marks omitted)).

Because Plaintiff has an adequate remedy at law, Wynn's motion to dismiss Plaintiff's unjust enrichment claim (Count II) is GRANTED.

**IV.      CONCLUSION**

Accordingly, Wynn's motion to dismiss, [ECF No. 16], is GRANTED in part and DENIED in part.  Wynn's motion to dismiss Plaintiff's unjust enrichment claim (Count II) is GRANTED.  Wynn's motion to dismiss (Counts I, III–V) is otherwise DENIED.

**SO ORDERED.**

July 9, 2020                                                    /s/ Allison D. Burroughs
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE